```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
                         ATHENS DIVISION

SUSANNA SCHAEFER,                  *
                                   *
      Plaintiff,                   *
                                   *
vs.                                *
                                         CASE NO. 3:10-CV-28 (CDL)
ATHENS   DOWNTOWN   DEVELOPMENT    *
AUTHORITY,
                                   *
      Defendant.
                                   *
```

O R D E R

Plaintiff Susanna Schaefer ("Schaefer") claims that her former employer, Athens Downtown Development Authority ("ADDA"), unlawfully retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") when it terminated her employment because she complained of ADDA's failure to take immediate and appropriate corrective action to remedy the conduct of a third party who she believed created a hostile work environment based on gender. ADDA seeks summary judgment (ECF No. 19), arguing that it cannot be held responsible for the conduct of a third party's employee. For the following reasons, ADDA's motion is denied.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

The facts, viewed in the light most favorable to Schaefer, are as follows.

**I. The Sexually Hostile Conduct**

ADDA regulates parking in downtown Athens, Georgia, including a parking deck located on College Avenue ("College Avenue Deck" or "deck"). Schaefer began working for ADDA on October 4, 1999 as a parking booth attendant at the College Avenue Deck. ADDA contracted with Sizemore Security to provide security guards at the deck. In December 2008, Mike Gabriel ("Gabriel"), a security guard employed by Sizemore Security, began working at the College Avenue Deck. Gabriel sometimes worked the same shift as Schaefer, often late at night.

On the first occasion that Schaefer and Gabriel worked together, Gabriel initiated sexually explicit conversations

2

about internet "chat rooms" that he visited in which the visitors expressed interest in different sexual proclivities. Gabriel described in detail the types of sexual activities engaged in by the people in the chat rooms and explained the code that symbolically matched the number of each room with a different sexual act. Gabriel told Schaefer that a person could have "all the sex you wanted" and "any kind of sex you wanted." Pl.'s Aff. 3:7-9, ECF No. 37.[1] According to Gabriel, he had visited all of the chat rooms and knew all of the people in them. He further inquired of Schaefer which chat rooms she would like and what she liked. He also informed her that a person could "find all kinds of orgy parties on the internet" and told Schaefer that he had been to many of them. *Id.* at 3:9-10. Gabriel's statements disturbed Schaefer and made her uncomfortable, particularly Gabriel's discussion of his own

---

[1] ADDA filed a notice of objection to Schaefer's affidavit, ECF No. 31, arguing that the Court should not consider it because it was not sworn, contains hearsay evidence and contains improper opinion testimony. Schaefer, however, has cured her failure to file a sworn affidavit by filing a sworn version with the Court. Pl.'s Aff. 49, ECF No. 37. Further, the statements made by Gabriel that are contained in the affidavit and referenced by the Court are not hearsay because they are not offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Finally, the Court does not rely on any improper opinion testimony. The Court also notes that ADDA accepted many of the allegations in Schaefer's Complaint as true by incorporating paragraphs of her Complaint in its statement of undisputed material facts, including her allegations regarding Gabriel's conduct and statements that Schaefer recounted in her affidavit. *See* Def.'s Statement of Undisputed Material Facts ¶ 7, ECF No. 19-2. Therefore, the Court finds it appropriate to rely on the portions of Schaefer's affidavit cited in this Order.

sexual activities. During the conversation, Gabriel also described how he downloaded software on his computer that allowed him to "crack" internet accounts and passwords. He then asked Schaefer for her internet identity information to see if he remembered her from the chat rooms.

After her first night working with Gabriel, Schaefer tried to have less contact with him. Whenever Gabriel wanted to talk, Schaefer attempted to make it clear that she was not interested by reading or telling him that she was busy. Gabriel would then stand near her booth, making Schaefer feel uncomfortable because she thought he was staring at her.

As part of her job as a parking booth attendant, ADDA required Schaefer to walk with Gabriel to the bank to make deposits. They took the deposits to the bank at the end of their shift, either around midnight or 1:45 a.m. While walking to the bank, Gabriel would often steer the conversation back to the topic of his activities in the chat rooms. For example, Gabriel said that he had been up all night the night before at "wild parties" with people he had met on the internet and that "all kinds of women [were] there." Pl.'s Aff. 5:12-17. He said he "had all kinds of fun" at the parties, *id.* at 5:19, and he repeatedly told Schaefer that she should go because she would have a lot of fun. She declined.

On another occasion, Gabriel, Schaefer and Sizemore Security guard Paul Brown ("Brown") were talking when Gabriel showed Schaefer a picture on his cell phone of a scantily clad, thin, young woman wearing a halter top style shirt and a miniskirt sitting on Gabriel's lap. In a different conversation between Gabriel and Brown—with Schaefer sitting nearby—Gabriel said that he took pictures during work of intoxicated college girls who were partially undressed. Gabriel described a specific incident where he waited outside of the back of a van for an intoxicated girl to return to the deck so that he could take a picture of her getting into the van in the short miniskirt that she was wearing. Gabriel explained he got "lucky" and was able to take a picture where he could "see everything." *Id.* at 9:2-18. Gabriel attempted to show Schaefer the picture.

On another occasion, Gabriel described a woman who walked by the deck wearing knee-high boots which he called "goat boots." *Id.* at 11:1. Gabriel then described to Schaefer the act of capturing and engaging in sexual acts with a goat. While describing the act, Gabriel made motions with his hips to illustrate. *Id.* at 11:1-13. He looked at Schaefer and said "[o]h, don't worry, she won't hurt you none."

On a different night, Schaefer and Gabriel were working alone and Gabriel offered her moonshine. He said the moonshine

5

was in a thermos in his car and that he would get it for Schaefer. She told him that she did not want any moonshine, but he repeatedly insisted that she drink it. Despite Gabriel's insistence, Schaefer did not drink it. Schaefer said that "knowing what [she knew] about Gabriel, it [would] be a cold day in Hades before [she] ever accept[ed] an open container beverage, late night from that man." Lookofsky Dep. Ex. 1, Email from S. Schaefer to W. Breland, Jan. 11, 2009, ECF No. 23 [hereinafter January 2009 Memo].

**II. Schaefer's Complaints Regarding Gabriel's Behavior and Schaefer's Complaints Regarding ADDA's Response**

Schaefer and another female ADDA employee, Terrica Bell ("Bell"), told their supervisors, Woodrow Breland ("Breland") and Laura Miller ("Miller"), that they were concerned about Gabriel. Schaefer drafted a memorandum ("January 2009 Memo") detailing her concerns about Gabriel's behavior. She sent the January 2009 Memo to Breland and copied Miller and the executive director of ADDA—Kathryn Lookofsky ("Lookofsky"). *See* January 2009 Memo.

In response to Schaefer's complaints regarding Gabriel's behavior, Sizemore Security conducted an investigation. Breland Dep. 14:11-16, ECF No. 25. The investigation was conducted by a Sizemore Security employee. *Id.* at 14:17-19. Schaefer was not interviewed during the investigation. Pl.'s Dep. 81:11-14, ECF

6

No. 35. After the investigation, Breland told Schaefer that "[ADDA] looked into it and it's not a problem. You're the only one with a problem with it." *Id.* at 81:19-21. Unsatisfied with Breland's response, Schaefer asked him "[a]re you kidding me? . . . Did you not hear [Bell] in the meeting say that she did not feel safe walking to the bank with [Gabriel]?" *Id.* at 81:21-24. Breland responded to Schaefer that she was the only one with a problem with Gabriel's conduct. *Id.* at 81:24-25. Breland told Schaefer that she would not have to work with Gabriel anymore. *Id.* at 82:5-6. Schaefer told Breland that she did not understand why ADDA still wanted Gabriel working at the College Avenue Deck given his behavior. *Id.* at 82:3-4. Schaefer also called Lookofsky who told Schaefer that it was determined not to be a problem. *Id.* at 82:16-19. Schaefer protested and asked Lookofsky that given Gabriel's actions and comments, "[a]ren't you worried about . . . what he's gonna do?" *Id.* at 82:20-24. Again Lookofsky responded that "[i]t was determined to not be a problem." *Id.* at 82:24-25.

Although both Lookofsky and Breland assured Schaefer that she would not have to work with Gabriel anymore, *id.* at 88:2-7, Schaefer and Gabriel continued to be scheduled during the same shift for approximately three weeks to a month after the investigation, *id.* at 90:1-7. Schaefer repeatedly complained to Breland about working the same shift as Gabriel and asked him

7

"when are you gonna do something about this?" *Id.* at 90:8-11; *see also id.* at 88:19-89:2. Breland responded on multiple occasions that he did not know what the security company did, and he "[did not] know what to tell [Schaefer]" about working with Gabriel. *Id.* at 88:23-25, 89:1-2, 90:11-12, 90:21-91:1.

When Schaefer and Gabriel were scheduled to work together, Schaefer asked Brown, another security guard, to stay with her until her shift ended so that she did not have to work alone with Gabriel. *Id.* at 89:2-7. Brown would stay even if his shift was over. *Id.* at 89:11-20. Breland told Schaefer to "do what you have to do" when she told him that she was "gonna make [Brown] stay." *Id.* at 90:13-14. ADDA knew that Brown stayed with Schaefer until her shift ended but never formally required or asked him to stay. *Id.* at 90:15-17. One day, Brown could not stay and Breland again said the he "[did not] know what to tell" Schaefer when she called to ask him what to do. *Id.* at 90:19-21. Schaefer "begged" Brown to stay, and he finally agreed even though he had other things to do. *Id.* at 90:22-23.

A few days after Valentine's Day, Breland informed Schaefer that Gabriel would not be working at the College Avenue Deck anymore. *Id.* at 94:18-19. Gabriel had reported to ADDA that Schaefer harassed him, and Breland did not believe Gabriel's accusation. As a result, Breland said Gabriel would no longer work there. *Id.* at 94:21-95:3. Schaefer, however, saw

8

Gabriel's car at the College Avenue Deck a few weeks later. Pl.'s Aff. 26:4-7. Schaefer called Miller to inquire about Gabriel's presence at the deck. *See* Lookofsky Dep. Ex. 6, Email From L. Miller to W. Breland, Mar. 16, 2009, ECF No. 23. Miller told Schaefer that her concerns about Gabriel should be directed to her supervisors at ADDA and could not be addressed to Sizemore Security. *Id.* Miller told Schaefer that "drama in the workplace was not going to be tolerated." *Id.* Miller advised Breland of her conversation with Schaefer and told him that "[u]ndoubtedly, [Schaefer] will continue to beat this dead horse. Feel free to remind her that I told her to drop it once and for all. The only time she is allowed to bring up the 'Mike the security guard' issue is if he actually DOES show up and harass her." *Id.*

ADDA terminated Schaefer's employment on April 6, 2009. According to Breland, the reasons ADDA discussed for Schaefer's termination were her "complaints and so forth were just difficult to deal with." Breland Dep. 25:1-6; *see also* Lookofsky Dep. 34:8-14 (noting that reason for Schaefer's termination was that her supervisors were "generally exasperated" because "working with [Schaefer] in general was constant complaining and it had gone on for a long time."). Although Breland said Schaefer's termination was because of her complaints that did "not necessarily ha[ve] to do with

9

security," he acknowledged that the complaints related to the "drama" at the College Avenue Deck surrounding the situation with Gabriel and Schaefer. Breland Dep. 25:7; *id.* at 25:10-26:8 (acknowledging that complaints involved the drama related to the "Mike the security guard issue" that he and Miller referenced in their March 16 emails); *accord* Lookofsky Dep. Ex. 6, Email from L. Miller to W. Breland, Mar. 16, 2009, ECF No. 23. Miller told Schaefer over the phone—during a conversation that included Lookofsky and Breland—that the reason for her termination was that "[t]his just is not working." Breland Dep. 29:25-30:7. Schaefer's termination letter offered no reason for her dismissal. Lookofsky Dep. Ex. 3, Letter from L. Miller to S. Schaefer, Apr. 6, 2009, ECF No. 23. Gabriel continued to work at the deck after Schaefer's termination. Breland Dep. 26:9-14.

DISCUSSION

Title VII prohibits retaliation by an employer against an employee who "oppose[s] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, Schaefer must demonstrate that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal relation between the two events. *Brown v. Metro. Atlanta Rapid Transit Auth.*, 261 F. App'x 167, 174 (2008). If Schaefer establishes a prima facie

case of retaliation, the burden shifts to ADDA to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). If ADDA articulates a legitimate non-retaliatory reason, Schaefer must then show that ADDA's proffered reason is pretext for retaliation. *Id.* at 1181-82.

In this case, ADDA argues that Schaefer has failed to establish a prima facie case of retaliation. It is undisputed that ADDA terminated Schaefer, and thus she suffered an adverse employment action. The Court's analysis will therefore focus on the two remaining elements of her prima facie case—whether Schaefer engaged in statutorily protected activity and whether a causal relationship exists between that activity and her termination.

### I.   **Statutorily Protected Activity**

ADDA contends that Schaefer cannot establish that she engaged in a statutorily protected activity. "[E]ven if conduct complained about is not unlawful, a plaintiff can establish a prima facie case of retaliation under Title VII if [s]he had an objectively reasonable belief that [s]he opposed an unlawful employment practice." *Brown v. Metro. Atlanta Rapid Transit Auth.*, 261 F. App'x at 174 (internal quotation marks omitted). Therefore, Schaefer does not have to establish that she was actually subjected to a sexually hostile work environment. She

11

must simply establish that she had an objectively reasonable belief that she was subjected to it and that she opposed it. *See id.* (noting that the employee must "not only show that [she] *subjectively* (that is, in good faith) believed that [her] employer was engaged in unlawful employment practices, but also that [her] belief was *objectively* reasonable in light of the facts and record presented." (internal quotation marks omitted)).

ADDA does not dispute that Schaefer subjectively believed that ADDA engaged in an unlawful employment practice by allowing her to be subjected to a sexually hostile work environment. It maintains, however, that her belief was not objectively reasonable because no reasonable person could conclude that ADDA was responsible for the harassing conduct which she complained rose to the level of a hostile work environment. To evaluate whether Schaefer had an objectively reasonable belief that she was being subjected to a sexually hostile work environment, the Court must preliminarily consider the elements of a hostile work environment claim. Those elements consist of making a prima facie showing "(1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily

abusive work environment; and (5) a basis for holding the employer liable." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003) (internal quotation marks omitted).

ADDA does not dispute that Schaefer had an objectively reasonable belief that: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on her sex; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and created a discriminatorily abusive work environment. Therefore, since ADDA does not dispute in its motion that Schaefer objectively believed she was subjected to a sexually hostile work environment, the Court will not address those issues. *See Fils v. City of Aventura*, No. 09-10696, 2011 WL 3241618, at *8 (11th Cir. July 28, 2011) ("[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by the parties."). ADDA's primary argument on summary judgment is that Schaefer's belief that ADDA engaged in an unlawful employment practice was not objectively reasonable because the conduct she complained about is not attributable to ADDA. Specifically, ADDA argues that because Gabriel was not an ADDA employee, Schaefer could not have an objectively reasonable belief that she was reporting an unlawful employment practice of ADDA by complaining about Gabriel's behavior. ADDA's basic

contention is that no basis exists for holding ADDA liable for any hostile work environment that Gabriel created.

ADDA's argument, however, misconstrues Schaefer's underlying basis for her retaliation claim and overlooks relevant Eleventh Circuit precedent. Schaefer's claims are based on ADDA's responses to Gabriel's conduct, not Gabriel's conduct alone. "It is well established that employers may be liable for failing to remedy the harassment of employees by third parties who create a hostile work environment." *Beckford v. Dept. of Corr.*, 605 F.3d 951, 957 (11th Cir. 2010). The Eleventh Circuit has held that an employer can be liable for the conduct of a third party "'if the employer fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known.'" *Id.* at 957-58 (quoting *Watson*, 324 F.3d at 1258 n.2). "Because liability is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer. Ability to 'control' the actor plays no role." *Id.* at 958 (internal quotation marks omitted). Employers "have an arsenal of incentives and sanctions . . . that can be applied to affect conduct. It is the use [of] (or failure to use) these options that makes an employer responsible—and in this respect [third parties] are no

14

different from employees." *Id.* (alterations in original) (internal quotation marks omitted).

The Court finds that there is sufficient evidence from which a reasonable juror could conclude that Schaefer had an objectively reasonable belief that ADDA failed to take immediate and appropriate corrective action to remedy Gabriel's conduct. It is undisputed that ADDA knew about Gabriel's comments and conduct towards Schaefer. *See* January 2009 Memo 1-2. The record further reveals that Schaefer repeatedly complained to ADDA about its response to her complaints about Gabriel. Pl.'s Dep. 81:21-82:4, 88:2-89:2, 90:10-91:1; Lookofsky Dep. Ex. 6, Email From L. Miller to W. Breland, Mar. 16, 2009, ECF No. 23. ADDA allowed a Sizemore Security employee to conduct an investigation that did not include any questioning of Schaefer. ADDA concluded that Schaefer was the only one with a problem with Gabriel, and therefore the situation was determined not to be a problem. Pl.'s Dep. 80:25-81:25, 82:24-25. Although ADDA claimed that Schaefer would not have to work with Gabriel anymore after the investigation, Gabriel continued to be scheduled during the same shift as Schaefer. *Id.* at 90:1-7. When Schaefer complained about this, her supervisor said that he "[did not] know what to tell" her and that he did not know what the security company did. *Id.* at 88:23-89:2, 90:10-12, 90:21-91:1. On her own initiative and without any action from ADDA,

15

Schaefer resorted to asking another security guard to stay with her until the end of her shift every time she was scheduled to work with Gabriel. *Id.* at 89:2-20, 90:10-23. Based on these facts, the Court finds that a reasonable juror could conclude that Schaefer had an objectively reasonable belief that ADDA failed to take immediate and appropriate corrective action to remedy the alleged harassment, and thus she had a reasonably objective belief that a basis existed for holding ADDA liable. *See Watson*, 324 F.3d at 1262 (concluding that continuing to send plaintiff to customer's construction site where previous incident occurred could reasonably be viewed as failure to take corrective action).

The primary case relied on by ADDA, *Little v. United Technologies*, 103 F.3d 956 (11th Cir. 1997), is distinguishable because Schaefer, unlike the employee in *Little*, opposed ADDA's failure to take corrective action in response to her complaints about Gabriel, as compared to simply opposing the harassing conduct alone. *See id.* at 959-960 (finding that plaintiff did not have objectively reasonable belief that he opposed an unlawful employment practice of his employer because single racially offensive comment by his co-worker was not attributable to employer). Accordingly, the Court concludes that a fact dispute exists as to whether Schaefer had an objectively

16

reasonable belief that ADDA engaged in an unlawful employment practice.

## II. Causal Relation Between Protected Activity and Adverse Employment Action

ADDA makes a general argument in its brief that Schaefer cannot establish a causal link between a statutorily protected activity and her termination because she cannot demonstrate that she engaged in a statutorily protected activity.  Def.'s Br. in Supp. of Mot. for Summ. J. 8, ECF No. 19-1.  As discussed above, however, the Court has concluded otherwise.  In its reply brief, ADDA makes a more specific causation argument, claiming that Schaefer cannot establish causation based on temporal proximity because her termination occurred three months after she complained about Gabriel.  Def.'s Reply 5, ECF No. 28. Arguments raised for the first time on reply are waived.  *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1328 n.4 (11th Cir. 2004).

Even if ADDA's argument had been timely raised, it would fail.  "[A] plaintiff need only show that the protected activity and the adverse action were not wholly unrelated."  *Brown v. Metro. Atlanta Rapid Transit Auth.*, 261 F. App'x at 175. Although ADDA argues that three months elapsed between Schaefer's January 2009 Memo detailing her concerns about Gabriel and her termination, Schaefer repeatedly complained

17

after she sent the January 2009 Memo to ADDA about ADDA's failure to keep Gabriel from working at the deck during her shift.

Moreover, evidence of causation exists in the record beyond temporal proximity. Breland acknowledged that the reasons discussed for Schaefer's termination were her "complaints and so forth were just difficult to deal with." Breland Dep. 25:1-6; *see also* Lookofsky Dep. 34:8-14 (noting that reason for Schaefer's termination was that her supervisors were "generally exasperated" because "working with [Schaefer] in general was constant complaining and it had gone on for a long time."). Breland said that the complaints he referenced as the reason for her termination related to the drama at the College Avenue Deck surrounding the situation with Gabriel and Schaefer. Breland Dep. 25:10-26:8 (referencing emails discussing Schaefer's complaints involving the "drama" at the parking deck related to the "Mike the security guard issue"); *accord* Lookofsky Dep. Ex. 6, Email from L. Miller to W. Breland, Mar. 16, 2009, ECF No. 23. Miller expressly warned Schaefer that "drama in the workplace was not going to be tolerated." *See* Lookofsky Dep. Ex. 6, Email From L. Miller to W. Breland, Mar. 16, 2009, ECF No. 23. Miller instructed Breland to "[f]eel free to remind [Schaefer] that I told her to drop [the issue with Gabriel] once and for all" and that Schaefer was not allowed to "bring up the

18

'Mike the security guard' issue" unless he showed up and harassed her. *Id.* From this evidence, a reasonable juror could conclude that ADDA fired Schaefer because of her repeated complaints about ADDA's failure to keep Gabriel from working at the College Avenue Deck where he created a sexually hostile work environment. Accordingly, the Court finds that Schaefer has presented a prima facie case of retaliation.

ADDA does not proffer a legitimate non-discriminatory reason for Schaefer's termination. It relies solely on its contention that Schaefer failed to establish a prima facie case of retaliation in support of its motion for summary judgment. The Court notes that ADDA pointed the Court to evidence of an argument between Schaefer and another ADDA employee a few days before Schaefer was terminated. Pl.'s Dep. 122:1-129:8. The Court observes that even if ADDA intended to rely on this incident as the reason for her termination, Schaefer has pointed the Court to sufficient evidence creating a genuine dispute as to whether such a reason was pretext for retaliation. *See* Breland Dep. 25:1-26:8 (stating reasons discussed for Schaefer's termination were her complaints and because of the drama she created); *id.* at 29:25-30:7 (noting that the only reason Miller gave Schaefer for her termination was that "this just is not working"); Lookofsky Dep. 34:8-14 (noting that reason for Schaefer's termination was that her supervisors were "generally

19

exasperated" because "working with [Schaefer] in general was constant complaining and it had gone on for a long time."); Lookofsky Dep. Ex. 6, Email From L. Miller to W. Breland, Mar. 16, 2009, ECF No. 23 (noting that Miller warned Schaefer that drama would not be tolerated and that she needed to drop the Gabriel issue "once and for all").

For all of these reasons, ADDA's motion for summary judgment is denied.

## CONCLUSION

Based on the reasons stated above, ADDA's Motion for Summary Judgment (ECF No. 19) is denied.

IT IS SO ORDERED, this 7th day of September, 2011.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE